# BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

| | |
|---|---|
| STATE OF INDIANA ) | MHRC NO.   EO-0074-A19 |
| ) | |
| COUNTY OF ALLEN ) | EEOC NO.   24D-2019-00112 |

**Holly H. Volz**
7929 Fountainhead Place
Fort Wayne, Indiana 46835
*Complainant,*

**Christopher C. Myers**
Christopher C. Myers & Associates
809 S. Calhoun Street, Suite 400
Fort Wayne, Indiana 46802

v.

**Fort Wayne Fire Department**
One East Main Street, Suite 901
Fort Wayne, Indiana 46802
*Respondent.*

**Gary Johnson**
Beckman Lawson, LLP
201 West Wayne Street
Fort Wayne, Indiana 46802

## THE DETERMINATION HEARING

**COMES NOW,** the undersigned members of the **Determination Panel** and pursuant to Commission Rule **1-4.4** do make the following determination:

### I. JURISDICTION

On January 11, 2019, the Complainant, Holly H. Volz ("Complainant"), filed a complaint against Fort Wayne Fire Department ("Respondent"), alleging that Respondent harassed Complainant in employment on the basis of sex and retaliated against Complainant in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, and also in violation of City of Fort Wayne General Ordinance G-21-78 ("Ordinance"), as amended. Complainant also alleged that she was perceived as disabled in violation of The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") and the Ordinance.

#### A.   Timeliness

For a complaint to be "timely," Complainant must file with the Commission within 180 days of the last date of harm. The alleged incident(s) giving rise to these allegations occurred on or around August 29, 2017 and continued until January 11, 2019. Since the date of harm occurred around August 29, 2017, and continued until January 11, 2019, and the charge was filed on January 11, 2019, well within 180 days of the last date of harm, the timeliness jurisdictional requirement is therefore met.

1


EXHIBIT
B

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

### B.    Personal Jurisdiction

Respondent's place of business is located at One East Main Street, Suite 901, within the territorial boundaries of the City of Fort Wayne, State of Indiana.  The Ordinance requires that the Commission exercise jurisdiction against employers with at least six (6) employees.  To be under the jurisdiction of Title VII and ADAAA, an employer must have fifteen (15) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.  In other words, an employer must have fifteen (15) or more employees each day for a twenty week period during the year the discrimination occurred or the year prior to the discrimination.  Because the Respondent had fifteen (15) or more employees for twenty weeks in the two-year period between January 11, 2017, and January 11, 2019, personal jurisdiction has been met.

### C.    Subject Matter Jurisdiction

As indicated above, Complainant is alleging that the Respondent harassed them on the basis of sex and retaliated against them in violation of Title VII and the Ordinance.  Complainant also alleged that she was perceived as disabled in violation of ADAAA. The Commission has authority to enforce these laws. Subject matter jurisdiction is therefore met.

## II.  THE CHARGE, SUMMARY OF RESPONSE AND REBUTTAL

The Commission's complaint process commences with the filing and acceptance of a charge.  The charge is forwarded to the Respondent for an answer or response to the charge, including an invitation for both parties to enter into voluntary mediation.  Following receipt of the response, the Commission, if it deems necessary, makes pertinent provisions available to the Complainant for a rebuttal.  If a Complainant fails to rebut, the Commission will make a determination on the record available to it, including any independent evidence acquired. Following a rebuttal, or lack of, the Commission utilizes any series of investigative tools to bring the investigation to as prompt a completion as resources dictate.

### A.    Complainant's Charge

On January 11, 2019, Complainant alleged and signed the following statement:

I am a qualified female who is employed by the City of Fort Wayne Fire Department ("FWFD").  Around February 10, 2018, I submitted a complaint against Adam O'Connor ("O'Connor") about improper conduct.  I felt he spoke to me in a way that was degrading, as a woman.  After filing my complaint, I began to get referred to as a "whiny cunt" and was getting treated differently by other firefighters because the entire staff had to sit through harassment training.  In December 2018, I did not succeed on my first attempt of my work performance evaluation.  Instead of following policy, I was told I needed to see a doctor.  After this, I was told I needed to do physical therapy and would be on alternative duty.  I believe that policy was not followed because I filed my complaint in February 2018 and that I am also being perceived as someone with a disability.

For these reasons, I believe I was harassed based on my sex, female and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended and Fort Wayne Ordinance G-21-78, as amended.  I also

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

believe I am being perceived as disabled in violation of The Americans with Disabilities Act Amendments Act of 2008 and Fort Wayne Ordinance G-21-78, as amended.

### B.    Respondent's Response to Complainant's Charge

Respondent denied the allegations and in summary stated the following:

On August 30, 2017, Respondent was called to a fire at Canterbury Green Apartments. When Assistant Chief O'Connor ("O'Connor") arrived at the scene he found Complainant on her knees, sweating, and looking exhausted. O'Connor asked Complainant if she could complete the assignment and Complainant responded that she "just needed a fucking minute." Complainant returned to the assignment. After the fire was under control, O'Connor spoke with Complainant and believed that there was no issue between the two and it was just a tense moment.

On February 10, 2018, Complainant made a complaint that O'Connor humiliated her and belittled her abilities in front of several other coworkers. Complainant's complaint was investigated and found to have insufficient merit to warrant formal discipline. Furthermore, Respondent was not aware of any individuals referring to Complainant as a "whiny cunt." If Complainant disclosed the identity of who she believed used the term then Respondent would investigate promptly. Respondent admits that the entire department was required to attend harassment training. The training was a result of the Union's concerns, not Complainant's complaint.

All firefighters are required to complete an annual fitness evaluation. Firefighters are required to complete the physical tasks within eight (8) minutes and thirty-one (31) seconds, or less. If a firefighter takes longer than eight (8) minutes and thirty-one (31) seconds but less than nine (9) minutes and thirty-one (31) seconds they are required to retest after a seventy-two (72) hour resting period. If the firefighter cannot complete the tasks within nine (9) minutes and thirty-two (32) seconds they are referred to a designated physician to determine whether the firefighter is fit for duty. The Wellness-Fitness Policy then prescribes the steps that are necessary for the firefighter to return to active duty. A firefighter cannot return to active duty until they get clearance from the City physician and they must pass the work performance evaluation.

On December 7, 2018, Complainant attempted to do her work performance evaluation and after three (3) minutes and thirty-four (34) seconds she stated that she could not continue. Because Complainant did not finish within nine (9) minutes and thirty-one (31) seconds, she was referred to the City physician. Complainant was evaluated by the physician later that day and it was determined that she needed to be evaluated by a physical therapist and have a psychological evaluation for stress and anxiety.

On December 10, 2018, Complainant spoke with Heather Van Wagner ("Van Wagner") from the City's Risk Management Department and claimed that she should have been placed on alternate duty and be allowed to retest within seventy-two (72) hours. Van Wagner explained the policy and told Complainant to keep the appointment with the physical therapist. Complainant also got evaluated by the physical therapist on December 10, 2018 and it was determined that Complainant had "general muscle weakness." It was also determined that Complainant would need to begin a work conditioning program that would last around three to four (3-4) weeks.

3



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

On December 17, 2018, Complainant left a message with Respondent that her physician did not want her to return to duty and that Complainant would no longer be attending physical therapy. Complainant's physician also stated that Complainant would be re-assessed on January 17, 2019. On January 13, 2019, Complainant sent an email to Respondent stating that she was having a surgery on her foot and her doctor had her off of work until May 1, 2019.

### C. Complainant's Rebuttal

Complainant submitted a rebuttal on March 18, 2019, and stated in summary the following:

At no point in time was Complainant on her knees. Complainant was sweating, like every other firefighter on the scene, and was soaked from the rainwater. O'Connor looked at Complainant and said, "What the fuck are you doing?" O'Connor did not wait for a reply and went onto say, "You know what? Forget it. I want someone else, someone who can actually do the job, not you." The comments were heard by Lt. Kelly Hurd, Brandon Bainter, and Caleb Raap as well as unnamed civilians, police, and firefighters. Lt. Kelly Hurd was concerned because Complainant responded by saying, "Who the fuck do you think you are talking to?" Later on the scene, O'Connor attempted to act like he had been previously joking and Complainant told O'Connor that it was not a good idea to "mess with a fifty (50) year old female in menopause." Respondent never investigated the incident. Respondent did not question Complainant or the witnesses she provided. Complainant was questioned by an attorney from Taft Law about the incident and gave the attorney a list of witnesses that were never contacted.

After Complainant filed her allegation of misconduct against O'Connor, O'Connor began to refer to Complainant as a "whiny cunt" around the administrative offices.

On December 7, 2019, Complainant decided not to finish her physical evaluation. Complainant was never contacted by anyone in Respondent's administration after not passing the physical evaluation. If a firefighter doesn't pass they are supposed to retake the test after seventy-two (72) hours. If the firefighter doesn't pass the second time, Respondent sends the firefighter to the city physician for an evaluation. If the city physician does not have any concerns the employee is assigned to a Fire Department Peer Fitness trainer for work conditioning and the firefighter is on alternate duty for six (6) weeks. After the six (6) weeks, the firefighter retakes the physical exam. Lahey and Risk Management did not follow the steps for Complainant. Complainant believes it was Lahey's attempt to retaliate against her because she filed a charge of misconduct against Lahey's best friend, O'Connor.

When Complainant met with the city physician she told Complainant that she was told to send Complainant for an evaluation by a physical therapist. Respondent never responded to Complainant's request for a mental health evaluation and VanWagner told Complainant that it was "not her problem" and any mental help would need to come from Lahey. Lahey and O'Connor demanded that Complainant return to alternate duty and attend physical therapy for three (3) to four (4) hours each shift. Lahey and O'Connor also required Complainant to work on weekends which has never been required for other alternate duty firefighters.

Complainant felt the situation wasn't being handled correctly and made an appointment with her own physician. Complainant's physician referred her to a mental health counselor and removed Complainant from

4

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

duty. Complainant had a second appointment for January 17, 2019. The doctor had to reschedule the appointment. Respondent and the City of Fort Wayne did not believe Complainant and demanded a formal doctor's note explaining that the rescheduling was a request of the physician and not Complainant. Complainant's doctor ultimately removed Complainant from duty until her retirement date of April 24, 2019.

Respondent was required to do harassment training from the Commission by the City of Fort Wayne with the support of the union. After firefighters were made aware of the training, comments were made to Complainant about how Complainant should have "just taken" the treatment and that Complainant had "signed up for this" and should "just take" whatever was said or done to her.

## III.  SUMMARY OF INVESTIGATIVE PROCESS AND EVIDENCE

The Commission, in all, interviewed relevant witnesses and reviewed documents. Below is a summary of the evidence obtained during the investigation:

### A.  Respondent's Policies

**1.  Harassment and Retaliation Policy (March 3, 2016)**
The policy was provided by the Respondent and states in summary the following: Respondent does not tolerate conduct by any employee, visitor, or other department partner that unreasonably interferes with an individual's work, creates or participates in a hostile work environment, or utilizes any form of illegal discrimination or harassment to gain favors to retaliate against anyone else. If an employee feels they are being harassed or retaliated against, they are to notify any supervisor. A verbal complaint is accepted but it is encouraged to make a complaint in writing. The complaint will initially be investigated by the Fire Chief or their designee.

**2.  Wellness-Fitness Policy (September 2012)**
The policy was provided by the Respondent and states in summary the following: The Work Performance Evaluation ("WPE"), is a series of tasks performed in a controlled and organized environment that must be completed within the validates time parameters to determine if the Firefighter meets the minimum standards set forth by Respondent. A participant's WPE can be terminated for many reasons, including, by request from the participant or the participant removes the regulator from the face piece.

Passing time for the WPE is less than or equal to eight (8) minutes and thirty-one (31) seconds. If a participant's time falls between eight (8) minutes and thirty-two (32) seconds and nine (9) minutes and thirty-one (31) seconds, on the initial attempt, the participant is required to retest after a seventy-two (72) hour resting period. If the participant's retest attempt falls between eight (8) minutes and thirty-two (32) seconds and nine (9) minutes and thirty-one (31) seconds, or exceeds nine (9) minutes and thirty-two (32) seconds on any attempt, the participant is referred to the City Physician.

## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

If referred to the City Physician, the participant is placed on alternate duty and a consultation with the City Physician is scheduled. The City Physician(s) will review the participant's overall medical and fitness performance and make recommendations regarding their ability to return to full active duty status which may include diagnostic testing or participation in formal reconditioning under the direction of the Peer Fitness Trainer.

**B.    Telephone Interviews**

**1.    Employee One**

The witness stated in summary the following: Employee One was Complainant's direct supervisor. If Complainant had an issue, she would have reported it to Employee One and Employee One would have taken the issue to someone higher up. Employee One did not believe that women were treated differently than men on the job but recalled when Complainant had an injury she had to jump through more hoops.

Employee One was present at the fire in Canterbury when Complainant and O'Connor had an issue. Employee One heard that O'Connor wanted Complainant to do something then made a comment about finding someone else to do the job. Complainant informed Employee One of the conflict between her and O'Connor a few days after it happened and Employee One believed that Complainant felt O'Connor treated her that way because she is female. Employee One did not report the issue to anyone above him but did ask around if anyone heard anything. Employee One did not want to bring the issue to higher management because he was afraid to be retaliated against. Employee One believed that if people brought up issues about administrative staff then they would be targeted. Employee One was also not surprised by what was reported because it had become O'Connor's normal behavior so much that eventually O'Connor was confined to the offices.

Employee One did not recall having a conversation with O'Connor the day of the fire but there was also a lot going on. O'Connor was supposed to be Employee One's scribe, but O'Connor didn't want to be. O'Connor sent someone else that had never done the job in his place and freelanced the fire.

Employee One was in the process of retiring during the time of the harassment training going on but was never interviewed about any complaints related to O'Connor. Employee One did hear about O'Connor using the word "cunt" but wasn't sure who it was about. Employee One wouldn't be surprised if it was about Complainant though.

All the firefighters that resigned or left had taken a stance against something that the administration was doing and were retaliated against. Employee One believed that if you crossed the administration badly then you get bullied.

6

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

**C.    Onsite Interviews**

**1.    Employee Two**
The witness stated in summary the following: Employee Two did not have much interaction with Complainant and never worked with her. If someone feels they are being harassed, they are to go up the chain of command to report the issue. There used to be a Human Resources Chief or Internal Affairs Chief that would handle issues that employees had. Under the current administration there is no one in that role.

Employee Two stated that each station's atmosphere differs from one another. Some stations have more diversity, so lips aren't as loose with joking with one another. Women aren't always sure how they are going to be treated if they work with another crew. Employee Two believes there is an assumption that women cannot do the job and that women cannot just "have a bad day" like a man can. When Employee Two meets with recruits that are women, she informs them that everyday you come to the station you have to do your best. A guy can have a bad day and it's assumed by others that it is just a bad day. If a woman has a bad day, it is assumed that they cannot do the job. Male firefighters that don't believe women should be allowed will always look for ways to prove their opinion right and never for ways that prove them wrong.

Around 2007, a light duty policy went into effect for women firefighters when they became pregnant. Prior, women firefighters had to fight for the time off when male firefighters would use the time for an injury off work. Male firefighters would say that it was a choice to get pregnant. After the 2007 policy went into place it was seamless regardless of injury or pregnancy, all firefighters would fall under the sick policy.

Employee Two never experienced being used as an example that a girl can do the job to newer firefighters. Employee Two is aware of a situation that a female firefighter was being used as an example to show that a girl could do the job. A male firefighter that was present told Employee Two about it and said that he didn't understand why the female firefighter got upset because they were trying to be nice and show that women are capable.

Employee Two was not present for the Canterbury fire, but she heard that O'Connor said Complainant was "worthless" and used the word "cunt." Employee Two would not be surprised if the comments were in fact made but surprised that O'Connor would say them in front of others. Employee Two used to have a good relationship with O'Connor when he was her captain. When someone is on O'Connor's crew, he treats them great and they can do no wrong but everyone else is a "common idiot." There are more men to talk about, so it seemed like men got talked about more by O'Connor. O'Connor's go-to name for name calling was "pussy." Employee Two hasn't been face-to-face with O'Connor in about a year. Employee Two has also heard about O'Connor calling people "whiny bitches."

7



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

A lot of firefighters felt like the harassment training was some form of retaliation because complaints were made about O'Connor. Firefighters felt it was retaliation because the trainings were scheduled during dinner time and for the crews, dinner time is a sacred time. Firefighters knew that complaints were filed against O'Connor, not just Complainant's. One complaint had to do with O'Connor making a comment about lesbians. Employee Two was never interviewed about any of the complaints. Employee Two never heard or witnessed anyone ever tell Complainant that she signed up for the role so she should "just take" the treatment she was receiving.

2. **Employee Three**
The witness stated in summary the following: Employee Three has no issues and loves her job. Employee Three heard about the Canterbury fire but wasn't there. Employee Three heard that Complainant was not doing her job and O'Connor told her to get back to work. Employee Three heard people claim that O'Connor called someone a "whiny cunt" but never heard it first-hand. Employee Three also heard about all firefighters being referred to as "whiny bitches." Employee Three never heard people blame Complainant for having to participate in the harassment training.

3. **Employee Four**
The witness stated in summary the following: Heard that Complainant and O'Connor had an unpleasant conversation.

4. **Employee Five**
The witness stated in summary the following: If a firefighter believes they were being harassed they should go to the next up in rank and that person would take it up the chain of command. However, it is observed that if a firefighter complains they are considered a "complainer", so it is an unspoken understanding to handle issues yourself in fear of retaliation.

Doesn't believe there is a difference in the environment for a male and female firefighter. It is small things, like being referred to as "young lady" by an older male. There are moments when people talk differently because a female firefighter walks into the room. It also seems like the women firefighters are treated as a group, rather than like individuals because there are fewer women than men. There seems to be unneeded drama for women firefighters.

Employee Five was not present at the Canterbury fire but heard there was a conflict between Complainant and O'Connor. Employee Five heard that O'Connor said something derogatory about Complainant but did not hear about specifics. Employee Five heard about O'Connor using the term "whiny cunt" about Complainant but also referred to a group of firefighters as "whiny cunts."

## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

Employee Five heard that the harassment training had to do with O'Connor and that O'Connor got a few days of suspension. Firefighters assumed that it had to do with Complainant's allegation.

Employee Five had heard of several complaints related to retaliation for having a difference of opinion or making a complaint. Employee Five had some nerves about participating in the investigation with the Commission because initial interviews were conducted in the Fire Administration office. Employee Five believes that the time spent at the interview will be monitored.

5. **Employee Six**
The witness stated in summary the following: Respondent has a harassment policy. If someone feels they are harassed, they should contact their immediate supervisor. Once reported, the supervisor should take it up to next in rank. The environment when working for Respondent is like a family and there is joking around with each other. There can be differences between individuals and those often get handled easily.

Employee Six was not at the fire but at one point in time Complainant explained what had happened at the fire in Canterbury. Employee Six could not remember exactly what Complainant said but remembered that Complainant had an issue with the way she was treated by O'Connor. Employee Six recalled that Complainant made reference that she felt she was treated the way she was because she is a woman. When Complainant came to Employee Six with her concerns, about a few weeks or a month after it took place, Employee Six had a conversation with Lahey and O'Connor. Complainant then filed an allegation of misconduct and once she did that it was presented to the Mayor of Fort Wayne. An investigation was then conducted by Taft Law Firm. Employee Six was interviewed during the Taft Law Firm investigation. Taft Law Firm was investigating several issues, not just Complainant's allegation. Employee Six was not made aware of the outcome of the investigation. Employee Six stated that there have been other complaints of misconduct about O'Connor as well. The others that complained were males.

Employee Six never heard anyone refer to Complainant as a whiny cunt. Employee Six heard other firefighters make comments about the harassment training that firefighters had to do, and it being enforced because Complainant filed a charge of misconduct along with the other allegations that were filed from other firefighters. Employee Six believes that the City of Fort Wayne enforced the harassment training. It happened right after the investigation that Taft Law Firm did so it is assumed that the training was a result of that investigation. Employee Six never heard anyone directly say it to Complainant or necessarily blame her but that the training was a result of her allegations filed. Employee Six stated that the sentiment that firefighters "know what they signed up for" exists in general.

9



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

Employee Six is not involved in firefighters taking their WPE. If a firefighter stops the WPE, and does not complete it, the firefighter would immediately begin the rehabilitation process. If a firefighter finishes but goes over the allotted time, then they get to retake the WPE in seventy-two (72) hours. Complainant did contact Employee Six when she did not complete her WPE or did not complete it in the required amount of time and told Employee Six she was being sent to rehabilitation.

If a firefighter feels they need a mental health evaluation they would use the EAP program through the City of Fort Wayne or seek outside assistance themselves. Employee Six was not informed by anyone that Complainant requested a mental health evaluation.

**6.    Employee Seven**
The witness stated in summary the following: Employee Seven believed that women and men were treated equally within the department but that there was a divide between the administration and the stations. Employee Seven did hear O'Connor make a comment at Station 16 that the department was becoming "pussified" and referred to firefighters, in general, as "fucking cunts." The firefighters around didn't say anything because O'Connor is a Chief. Employee Seven was not sure if it was normal behavior for O'Connor because Employee Seven is not around O'Connor enough.

Employee Seven was present at the Canterbury fire. Employee Seven was walking up to an apartment and Complainant and her crew had been in the apartment. A couple of the crew had low air alarms going off, so they needed to recycle. O'Connor was right there, and he told Complainant that he needed Complainant and her crew back in the apartment to complete a task. Complainant stated that they would as soon as they got air. O'Connor yelled back at Complainant and stated he needed her and her crew back in the apartment "now." Complainant told O'Connor again that she would take her crew back in once they got air. O'Connor said, "God damnit, I want you in there now." Complainant stated again that they needed air bottles and walked away. O'Connor then said, "fucking women." Employee Seven and another firefighter were surprised by the interaction. Comments about women are not generally made within the department that Employee Seven is aware of. Employee Seven was never interviewed or questioned about the events.

Employee Seven heard rumors about Complainant being called a "whiny cunt." Employee Seven was told that Complainant was a nuisance to the administration and that the administration did not care for her. Employee Seven heard these comments often. Employee Seven was aware that Complainant was being informed about the comments that were being said about her. Employee Seven felt that ever since Complainant was vocal about her spouse's demotion within the department, the comments began and there was tension between Complainant and the administration. Employee Seven believed that other firefighters thought that Complainant was also a nuisance because she abused the sick policy and she needed "to go."

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

Employee Seven was not aware of anyone blaming Complainant for the harassment training that all firefighters had to do. Firefighters complained about the training, but no blame was put on anyone. Employee Seven was not aware of anyone telling Complainant that she needed to just take the treatment she was receiving because it was what she signed up for.

If a firefighter wants a mental health evaluation a firefighter uses the City of Fort Wayne's EAP program.

7. **Employee Eight**
The witness stated in summary the following: If a firefighter believed they were being harassed, they would go to their supervisor and the supervisor would go to the Battalion Chief. Employee Eight believes that the atmosphere is the same for all firefighters.

Employee Eight was at the Canterbury fire. Employee Eight witnessed Complainant and O'Connor talking but was not sure what they were talking about. Employee Eight never heard anything specific about their conversation. Employee Eight never heard of anyone using "whiny cunt" to describe another firefighter. Employee Eight did hear a rumor that O'Connor referred to Complainant as a "whiny cunt." Employee Eight assumed others were talking about it as well. Employee Eight never heard about O'Connor referring to anyone as a "whiny cunt."

Employee Eight was not aware of anyone blaming Complainant about having to participate in harassment training. Employee Eight was not aware of anyone telling Complainant she needed to take the treatment she received because it was what she signed up for.

8. **Employee Nine**
The witness stated in summary the following: If a firefighter felt they were being harassed they would go up the chain of command to report. Employee Nine believes that the environment in the department is the same for everyone and has never had any firefighters complain about treatment they received.

Employee Nine was at the Canterbury fire. Employee Nine remembers that Complainant and O'Connor had a brief conversation but was not aware of what it was about. Employee Nine was never questioned about the conversation between Complainant and O'Connor. Employee Nine does not recall O'Connor saying "fucking women" at the fire. Employee Nine has never heard or heard of anyone being called or referred to as a "whiny cunt," has never heard or heard of anyone blaming Complainant for the harassment training the department went through or that Complainant was told she needed to take the treatment she was receiving because it was what she signed up for.

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

9.    **Employee Ten**

The witness stated in summary the following: If a firefighter feels they are harassed they should go up the chain of command and the allegations should be investigated. The Chief's office investigates the allegations. Employee Ten does not believe the environment is the same for everyone. Employee Ten believes that some have it harder than others. Employee Ten does not believe women are treated different than men but that the environment is "toxic." There have been times that issues were not taken to the next level. Employee Ten and an Assistant Chief made a complaint about O'Connor. In a meeting, O'Connor told the Head Academy Instructor that Respondent was not going to allow lesbians to work with female recruits anymore. O'Connor also said that they would screen female recruits to see if they were lesbians because then maybe the lesbian recruits would be comfortable working with other lesbian firefighters. The instructor stated that they would not be taking those actions. O'Connor replied stating that he was the Deputy Chief and he would "do whatever the fuck" he wanted. At this same meeting, O'Connor used the word "cunt." Employee Ten could not remember the firefighters name in which O'Connor was referring to but it was about a female firefighter that O'Connor felt was speaking inappropriately about her sex life at a station. When Employee Ten and an Assistant Chief talked to Lahey about it, Lahey stated that O'Connor would not have said that. Employee Ten was told the issue was investigated and legal was fine with actions. The other person that reported it with Employee Ten was pretty much ran out of his job.

Employee Ten was a superior to Employee One. If an issue was reported, Employee One could go to Employee Ten or to a Duty Chief. Employee Ten was not aware that Employee One ever went to anyone about the issues that Complainant reported to Employee One. Employee Ten was not present at the Canterbury fire until later. Employee Ten did not witness the interaction between Complainant and O'Connor at the Canterbury fire. Employee Ten heard many stories that something happened between them. Employee Ten did hear that O'Connor told Complainant to "get the fuck" out of his way, that O'Connor wanted someone that knew what they were doing, made the comment "fucking women," and threw the word "cunt" around but Employee Ten never heard it directly from O'Connor.

O'Connor used the word "cunt" on a daily occurrence in meetings with administration, battalion chiefs and fire stations. O'Connor would put a different adjective in front of it. It would be in reference about men and women. Employee Ten stated that there were several allegations made against O'Connor that were being investigated. Employee Ten stated that the entire department fell under the category of who was called a "whiny cunt," not just Complainant. Employee Ten never heard Complainant being referred to as a "whiny cunt" by anyone. Employee Ten never heard of anyone blaming Complainant for the harassment training that the department had to do. Employee Ten did hear O'Connor state that the training was being conducted because of things O'Connor had done. O'Connor was referencing the allegations that were being investigated which included

## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

Complainant's allegation. Employee Ten never heard anyone tell Complainant that she needed to take the treatment she was receiving because it was what she signed up for.

10. **Employee Eleven**

The witness stated in summary the following: If a firefighter feels they are being harassed they are supposed to inform a supervisor. You can also contact Human Resources or Metro. The allegations then get investigated. Employee Eleven was on Complainant's crew on the day of the Canterbury fire. Employee Eleven remembers there being an altercation between Complainant and O'Connor. Employee Eleven doesn't remember specifics but heard rumors about what was said. Employee Eleven did remember Complainant being upset the rest of the day. Employee Eleven was never questioned about the altercation. Employee Eleven was told that O'Connor called Complainant a "whiny cunt" from officers that were present at the fire. That was the only time Employee Eleven heard that word was used towards someone negatively but has heard other words that could be considered derogatory towards a woman used in a joking way. Normally those words weren't used if a woman was present. Employee Eleven never heard anyone blame Complainant for the harassment training or that anyone told Complainant to take the treatment she was receiving.

During Employee Eleven's first year, O'Connor came into the station. O'Connor made a homosexual joke to other firefighters in the station and turned to Employee Eleven and said, "You aren't a faggot, are you?"

11. **Eric Lahey ("Lahey") – Fire Chief**

The witness stated in summary the following: If a firefighter feels they are being harassed they should go through their chain of command. The issue will be investigated with the help of the legal department. Lahey was not at the Canterbury fire but O'Connor was at the scene and Respondent was struggling to gain control of the fire. After the fire, O'Connor spoke to Lahey about an exchange between O'Connor and Complainant. O'Connor said Complainant was given an assignment. Complainant looked tired and was out of breath. O'Connor asked Complainant if she was going to be able to get the job done. O'Connor said that Complainant replied aggressively and there was an exchange of expletives. Ultimately, Complainant complied with the assignment. After the fire, Complainant was in rehab and O'Connor approached Complainant to make sure everything was okay, and Complainant made a comment about being on her period. O'Connor said that the comment made him uncomfortable. O'Connor also talked to Jines as well about the comment because that is who Complainant reported directly to. No one, including Jines ever brought up any issues reported by Complainant.

About six (6) months later, Complainant made an allegation of misconduct and they were handled by the Mayor's office. Lahey had nothing to do with the investigation but was interviewed by an attorney at Taft Law Firm and believes Complainant's allegations were

13

## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

brought up in the interview but could not remember specifically. Per legal, there was no basis and no action needed to be taken.

Lahey never heard or heard about anyone refer to Complainant as a "whiny cunt" prior to Complainant's allegations she made with the Commission. Lahey never heard anyone blame Complainant for the harassment training or anyone ever telling her she needed to take the treatment she was receiving because she signed up for it.

While taking the WPE, if a firefighter's vitals are above the acceptable limits, they are given time to lower the vitals or go see a physician. A firefighter that finishes the WPE past the allotted time in the policy is given an opportunity to retake in 72 hours. If a firefighter starts the WPE and stops or does not finish, they are sent to the city physician.

When Complainant stopped and did not complete the WPE, she was sent to the city physician. Lahey consulted with Risk Management that same day and Risk Management informed Lahey that the doctor recommended that Complainant see a physical therapist. Lahey had no contact with the doctor so he was not aware of anyone telling the physician to suggest physical therapy for Complainant.

If a firefighter would like to have a mental health evaluation, they would need to use the EAP program that is accessible and provided to every employee of The City of Fort Wayne. Complainant mentioned to Risk Management that she made an appointment with EAP. Lahey knows that Risk and Complainant spoke about a mental health evaluation and if Complainant was referred back to him, he would have told her to utilize the EAP program.

12.    **Carol Helton ("Helton") – City Attorney**
The witness stated in summary the following: Helton is aware of who Complainant is but does not know her personally. Helton was aware that Complainant made an allegation of misconduct against O'Connor. It is not typical for an allegation of misconduct to be sent to another law firm to investigate but in this case there were several allegations of misconduct and one specifically against Lahey for "failure to supervise" so Lahey could not conduct the investigation like he normally would. Helton wasn't really involved with the investigations, but interviews were conducted for Complainant's allegations as well as the others. The law firm found no basis to Complainant's allegations.

13.    **Heather VanWagner ("VanWagner") – Director of Risk Management**
The witness stated in summary the following: VanWagner does not know Complainant personally but knows who she is. If a firefighter does not complete the WPE they are scheduled for an appointment with Business Health. Business Health would then determine whether or not the firefighter is fit or not to do the job. The physician can also assign physical therapy if they feel the firefighter needs it. In Complainant's case, the physician referred Complainant to physical therapy. VanWagner could not recall why Complainant was seen by two (2) different doctors. VanWagner was not aware of anyone

14



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

telling the physician that they needed to refer Complainant to physical therapy. Complainant asked VanWagner about a mental health evaluation. VanWagner told Complainant that she needed to talk to Lahey about that because it wasn't in her realm.

14. **Adam O'Connor ("O'Connor") – Deputy Chief**
The witness stated in summary the following: Before Complainant's allegations, O'Connor and Complainant had a mutual respect. Before the Canterbury fire, Complainant and O'Connor complimented each other and had a good relationship. If a firefighter feels they are being harassed, they should go up the chain of command and report the issues immediately. The issues are investigated with the consultation with legal.

O'Connor was present at the Canterbury fire. O'Connor asked for two (2) crews. Complainant showed up as the second crew. Complainant looked exhausted. O'Connor asked Complainant if she could do the assignment. Complainant stated, "I just need a fucking minute." After the assignment was complete, Complainant went to rehab and O'Connor went over to check on her. O'Connor asked Complainant if she was okay and Complainant said, "Don't worry about it, I'm just on my period." It seemed odd to O'Connor.

The following day, O'Connor brought up the conversation to Jines and Lahey. O'Connor never heard anything else about it for at least six (6) months. Jines never brought up any allegations made by Complainant. If Jines was aware of an issue, he would have reported it to the Operations Chief.

The Union President, Bush, was telling other firefighters that they should file complaints against O'Connor. O'Connor was interviewed by Taft about Complainant's allegations but was not disciplined for the allegations that Complainant made. O'Connor never referred to Complainant as a "whiny cunt" and only heard of the allegation when Complainant made her complaint with the Commission. Bad language is used within the department and the audience is always respected. Words like "cunt" and "bitch" would never be used in front of a woman because it would not be acceptable. There was an incident brought to light were the term "whiny cunt" was used by O'Connor referring the people that had an issue with a policy change that Bush was continuously addressing in meetings. It was not used against Complainant. Since that incident was brought to light a few months later, language like "cunt" and "bitch" were no longer acceptable.

O'Connor was not aware of anyone blaming Complainant for the harassment training. O'Connor was not aware of anyone telling Complainant that she needed to take the treatment she was receiving because she signed up for it. O'Connor was not aware of Complainant requesting a mental health evaluation.

15



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

Months before Complainant failed the WPE, O'Connor pushed that Respondent does not ignore a failure of the WPE and evaluate the employee and get them help because of the loss of another firefighter.

15. **Employee Twelve**
The witness stated in summary the following: If a firefighter believes they are being harassed they can ask the person to stop or go to the next up in rank. Employee Twelve has been aware of situations where an employee reported an issue to the next up in rank and the issue was not addressed.

Employee Twelve believes there is a difference in the environment for women and men. For a woman, every day is a rookie day. A woman firefighter always must prove themselves. Male firefighters want to show off that a woman can do a task so everyone should be able to. Employee Twelve doesn't believe they do it in a way to be mean but it's the stigma with the job. Employee Twelve believes comments and conduct occur that make female firefighters uncomfortable. As a firefighter goes up in rank, the maturity level should grow, and it's expected that a higher rank would call another firefighter out if they are out of line but that does not always happen. Employee Twelve is aware that O'Connor has called others in the department a "cunt" and it is offensive to women. When someone in such a high position is choosing to use words like "cunt" it is offensive and not common language in the department. There are other words used that are not appropriate but may not be offensive to some but could be offensive to others. Most of the time these comments are used in a joking manner. The conversations would probably offend the "average women" but not a woman on the fire department. O'Connor had mentioned that everyone on the job is the bottom of the barrel and that they tripped on their "dicks" and got the job. O'Connor was confronted about the comments. O'Connor voices his opinion too much and it crosses the line.

O'Connor has one person in each category that he is friends with. He has friended one female so he can say whatever he wants. Employee Twelve never heard it directly but did hear from others that O'Connor did not believe that women should be on the fire department. He also has certain crews he loves so he treats them better. O'Connor told Employee Twelve that the fire department should only include the biggest, fastest and strongest when Amy Biggs became the Chief. It was not comfortable to hear someone, that was going to be Employee Twelve's leader, talk badly about people when you work in dangerous situations.

Employee Twelve was not at the Canterbury fire but heard that Complainant and O'Connor got into a verbal altercation and O'Connor was insulting to her. Employee Twelve has heard that O'Connor made the comment "whiny cunts" in direction to the Complainant specifically as well as all firefighters collectively. Employee Twelve did not hear this directly but that word should not be used by anyone, especially when you are a leader because it gives permission for everyone to say it. It's known that O'Connor boasts about



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

leading by fear. Employee Twelve never heard anyone blame Complainant for the harassment training. At the time of the training, there were so many firefighters that had issues with O'Connor. Employee Twelve feels that the climate of the fire department is different for women because it's male dominated but never heard that anyone told Complainant to take the treatment she was receiving because it was what she signed up for.

When Employee Twelve was pregnant, firefighters asked if she would take the time off unpaid and save the sick policy time that is in place for the department for them, but male firefighters would go play softball, break a finger and use the sick policy time. It becomes hard to have conversations with those people, but she knows they don't appreciate her being on the department. Another female firefighter was called by Risk Management and asked if she wanted to be a mother or a firefighter. It sets a standard that a female is doing something wrong for having a baby. Now the sick policy has changed since there is now fraternal time for the males.

**D.    Harassment Investigation Information**

**1.    Complainant's Internal Complaint dated February 10, 2018**
This document was provided by the Respondent and states in summary: On February 10, 2018, Complainant filed an Allegation of Misconduct against O'Connor. Complainant stated that on August 29, 2017, while on duty at a fire at 2718 Canterbury Blvd., O'Connor showed conduct that was unethical or tends to demean, debase, ridicule, or degrade a fellow firefighter. Complainant reported to O'Connor at the fire and bent over to check something in her bunker pants pocket when O'Connor asked, "What the fuck are you doing?" O'Connor continued, "You know what...forget it, I want someone else. Someone who wants to do this job. Someone who CAN do this job, not you."

Complainant responded in less than a second with her own expletives then explained that she would not move to the next assignment until her crew was together. Complainant alleged that O'Connor belittled and humiliated her and her abilities, experience and authority in front of several firefighters, fire officers and civilian bystanders. After the fire was under control, O'Connor attempted to play his actions off as joke and no big deal.

**2.    Written Statement from O'Connor- undated**
This document was provided by the Respondent and states in summary: On August 30, 2017, there was a building fire at 2718 Canterbury Blvd. O'Connor went to stop the fire from traveling on the West side of the structure. Complainant's crew was assigned to assist. Complainant arrived ahead of her crew and dropped to her knees in the front of the structure without her SCBA mask or helmet on. Complainant was flushed, short of breath, sweating and looked exhausted. O'Connor did not recall cursing when he asked Complainant what she was doing. The situation was fairly intense, but O'Connor recalled Complainant responding to him and saying, "I just need a fucking minute." At that point, O'Connor asked Complainant if she could complete the assignment or not. Complainant



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

responded, "just needed a fucking minute." O'Connor recalls telling Complainant that he could get a different crew if she was too exhausted to continue. O'Connor denied saying, "You know what…forget it, I wasn't someone else. Someone who wants to do this job. Someone who can do this job, not you." Complainant's crew did fill the assignment.

When Complainant's crew were resting in the rehabilitation sector, O'Connor asked Complainant if everything was okay. Complainant responded, "We're good, it must just be because I am on my period." O'Connor relayed the conversation to Complainant's Battalion Chief, Dennis Jines because O'Connor felt uneasy about the comment that Complainant made.

O'Connor stated that he was disappointed that Complainant waited almost six (6) months to file the allegation of misconduct and found it noteworthy that Complainant filed the allegation that a few days after Union President, Jeremy Bush, told Chief Thomas that he was going to get O'Connor "removed from my position" and convinced four (4) firefighters to file charges against O'Connor.

**E.   Complainant's Personnel File Documents**

**1.   Complainant's Work Performance Evaluation ("WPE")- December 7, 2018**
The document was provided by the Respondent and states in summary the following: Complainant attempted her WPE on December 7, 2018. At three (3) minutes and thirty-four (34) seconds, Complainant stopped. The document was signed by Kelly Hurd ("Hurd") and Complainant.

**2.   Email from Hurd to Lahey on December 10, 2018**
The document was provided by the Respondent and states in summary the following: Complainant attempted her WPE on December 7, 2018. During the WPE, after the completion of the equipment carry event, Complainant stopped and said that she was done and did not want to continue. Complainant then clocked off her regulation prompting the course to be over. Complainant was advised of the policy in which she had seventy-two (72) hours to retest. Complainant stated that she was tired and had no interest in retesting in seventy-two (72) hours. The proctor was advised to contact the HSO Chief and advised the HSO Chief that Complainant had seventy-two (72) hours to retest.

**3.   Email from Jermaine Thomas ("Thomas") to Lahey on December 10, 2018**
The document was provided by the Respondent and states in summary the following: Thomas had spoken to the proctor of the exam about Complainant stopping during her WPE. The HSO Chief stated that he informed the proctor that he would review the policy and see what steps needed to be taken. The HSO Chief consulted with administration and per the policy, Complainant had exceeded the nine (9) minutes and thirty-two seconds on her WPE so she would need to be referred to a City Physician per the policy.



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

4.  **Thread of emails between Complainant and Kari Ramsey ("Ramsey")**

    The documents were provided by the Complainant and states in summary the following: On December 12, 2018, Complainant emailed Ramsey and stated that she wanted to review their conversation from that day and that Complainant was to report to alternate duty on December 13, 2018. Complainant also mentioned that she was feeling sick and was not able to report to alternate duty on December 13, 2018 but would keep her appointment for physical therapy. On December 13, 2018, Complainant emailed Ramsey and stated that she was able to get an appointment with her own doctor the following Monday and if cleared she would report to alternate duty on December 19, 2018. On December 17, 2018, Complainant emailed Ramsey and stated that her doctor did not feel good about Complainant returning to duty and was written off work until January 17, 2019. Complainant stated at that time, her doctor would see if returning to alternate duty and physical therapy would be okay. Ramsey replied and asked for something in writing from Complainant's doctor. Complainant sent the document and Ramsey replied the same day asking Complainant for a doctor's note for her absences on December 13, 2018 and December 16, 2018. Complainant replied stating that she was off work, sick, from December 10, 2018 through December 16, 2018 with the note from Dr. Bohnke previously sent.

F.  **Relevant Employee Files**

    At the time of the onsite, the Commission requested a list of all relevant employees. From that list, the Commission chose a relevant number of files to examine to determine whether any other individuals were treated more favorably than Complainant. During the review the Commission could not find another firefighter that was able to retake the WPE after seventy-two (72) hours of rest after stopping and not completing the WPE.

The determination below is based on the above summarized evidence.

## IV. __ANALYSIS__

Fort Wayne City Code, General Ordinance G-21-78 ("Ordinance"), as amended, makes it unlawful for an employer to discriminate against an individual on the basis of any one of several classifications, including but not limited to their disability, race, sex, color, religion or national origin.   Because the Ordinance, like the Indiana Civil Rights Law ("ICRL"), parallels Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended and Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), in its proscription of discrimination based upon expressed grounds (*e.g.*, disability, race, sex, color, religion or national origin), federal decisions interpreting Title VII and ADAAA are persuasive when reviewing a charge of discrimination under the Ordinance. A violation of Title VII, the ADAAA and the Ordinance may be established after a thorough analysis of relevant evidence.

To establish a claim of discrimination, Complainant bears the initial burden of demonstrating that the evidence supports such a claim. As set out in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, (7th Cir. 2016) the



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

Commission's analysis will consider all of the evidence in its entirety. Complainants must utilize the familiar burden shifting analysis first set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

### A.  Harassment/Sex

### Prima Facie Case

To establish an actionable claim of harassment discrimination, Complainant must show that they were subjected to harassment so severe or pervasive that it altered the conditions of employment. In assessing a hostile work environment claim, the Commission looks to all of the surrounding circumstances including the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating or mere offensive utterance, and whether the conduct unreasonably interfered with the employee's reasonable work performance.

Establishment of a prima facie case of harassment based on sex discrimination requires evidence as to the following four elements:  (1) Complainant was subjected to unwelcome comments and/or conduct; (2) The comments and/or conduct were based on Complainant's protected class; (3) The comments and/or conduct were severe or pervasive as to create a hostile work environment; and (4) There is a basis for employer liability.

### 1.  Complainant was subjected to unwelcome comments or conduct

A complainant must establish that he or she was subjected to unwelcome comments and conduct. In making this inquiry, the Commission must examine the totality of circumstances, such as the nature of the comments and/or conduct and the context in which they occurred. When evidence suggests that a complainant instigated the comment and/or conduct, such conduct may not be characterized as unwelcome. However, mere participation on the part of the complainant does not necessarily mean that the comments and/or conduct were welcome. One factor to be considered in determining whether the comments and/or conduct are unwelcome is whether the complainant objected when the alleged harassment occurred. Another factor to be considered is whether the complainant complained of the comments and/or conduct to the respondent. Based on reasonable assumption, when an individual objects to and complains to management about comments and/or conduct, it is unwelcome. Although these factors are not always determinable as to whether the comments and/or conduct is unwelcome, they are factors to be considered.

In this case, Complainant alleged that in August 2017, while at a fire in Canterbury, O'Connor looked at Complainant and said, "What the fuck are you doing?" Then stated, "You know what? Forget it. I want someone else, someone who can actually do the job, not you." Complainant also alleged that after reporting the conduct she was called a "whiny cunt" and was being blamed for mandatory harassment training that all firefighters had to participate in and was told that she should "just take" the treatment she was receiving because it was what she signed up for.

Regarding the allegation of Complainant being told she should "just take" the treatment she was receiving because it was what she signed up for, the Commission could not find any evidence to suggest this comment was made to Complainant. The Commission will end the analysis regarding this allegation and continue with the rest of Complainant's allegations of harassment.



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

Complainant alleged that in August 2017, while at a fire in Canterbury, O'Connor looked at Complainant and said, "What the fuck are you doing?" Then stated, "You know what? Forget it. I want someone else, someone who can actually do the job, not you." Testimony from Employee Seven revealed that Employee Seven was present at the Canterbury fire. Employee Seven was walking up to an apartment and Complainant and her crew had been in the apartment. A couple of the crew had low air alarms going off, so they needed to recycle. O'Connor was right there, and he told Complainant that he needed Complainant and her crew back in the apartment to complete a task. Complainant stated that they would as soon as they got air. O'Connor yelled back at Complainant and stated he needed her and her crew back in the apartment "now." Complainant told O'Connor again that she would take her crew back in once they got air. O'Connor said, "God damnit, I want you in there now." Complainant stated again that they needed air bottles and walked away. O'Connor then said, "fucking women." Employee Seven and another firefighter were surprised by the interaction. Testimony from Employee One revealed that heard that O'Connor wanted Complainant to do something then made a comment about finding someone else to do the job. Complainant informed Employee One of the conflict between her and O'Connor a few days after it happened and Employee One believed that Complainant felt O'Connor treated her that way because she is female.

Complainant also alleged that after reporting the conduct she was called a "whiny cunt" and was being blamed for mandatory harassment training that all firefighters had to participate in. Testimony from Employee One revealed that they heard about O'Connor using the term "cunt" or "whiny cunt" but was not sure who it was regarding. Testimony from Employee Five and Twelve revealed that they heard about O'Connor referring to Complainant as a "whiny cunt" but that O'Connor referred to a group of firefighters as "whiny cunts" as well. Testimony from Employee Seven revealed that they heard rumors about Complainant being referred to as a "whiny cunt" by O'Connor and that Complainant was a nuisance to the administration. Employee Seven heard these comments often and was aware that Complainant was being informed about the comments that were being said about her. Testimony from Employee Eight revealed that they heard about Complainant being referred to as a "whiny cunt" by someone but was not sure who used the word. Testimony from Employee Ten revealed that the entire fire department was under the category of "whiny cunt," not just Complainant. Testimony from Employee Five revealed that firefighters assumed the training had to do with Complainant filing a complaint. Testimony from Employee Six heard other firefighters make comments about the harassment training that firefighters had to do, and it being enforced because Complainant filed a charge of misconduct along with other allegations that were filed from other firefighters.

Based on the evidence found, the Commission will consider this element met.

## 2. The comments and/or conduct were based on Complainant's protected class

A complainant must prove that the alleged comments or conduct were made because of his or her protected characteristic. In other words, the complainant must prove that the comments and/or conduct were made on account of his or her race, sex, religion, etc. In most instances, an alleged harasser who makes unwelcome comments and/or conduct to all or a majority of employees is not basing the comments and/or conduct on the employees' protected class. Although unpleasant, the fact that an alleged harasser is treating everyone poorly and unfairly does not constitute an act of discrimination. Also, when facts show that the comments and/or conduct are based on a personality conflict between the individuals; this too does not constitute harassment under Title



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

VII. Again, the complainant must show that the comments and conduct were made because of his or her protected characteristic.

The evidence in this case revealed the comments were based on Complainant's protected class, sex, female. Testimony from Employee Seven revealed that at the Canterbury fire, O'Connor made the comment "fucking women" after Complainant and O'Connor had a verbal altercation where Complainant alleged that O'Connor made comments to her about her not being able to perform the job and wanting someone who could. The term "whiny cunt" is a comment based on Complainant's protected classes.

The Commission could not find that Complainant being blamed for harassment training was based on Complainant's protected class. Testimony from Employee Two, Employee Six, and Employee Ten revealed that several allegations were made at the time Complainant's was and the harassment training was believed to be a result of those complaints. Therefore, the Commission will continue with the analysis on the comments made at the Canterbury fire and the comment, "whiny cunt", and will end analysis regarding Complainant being blamed for the mandatory harassment training.

### 3. The comments and/or conduct was severe or pervasive as to create a hostile work environment

In evaluating whether the comments and/or conduct rises to the level of a hostile environment, the Commission examines all of the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. Petty slights, annoyances, and isolated instances (unless extremely serious) will likely not rise to the level of unlawful harassment. Comments and harassing acts that are continual, commonplace and ongoing are more likely to be deemed pervasive. Furthermore, harassment that escalates from comments to physical touching or physical threats are more likely to be considered as severe as to create a hostile work environment. Moreover, a hostile work environment is one that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."

In this case, evidence exists as to the third element. While Respondent disputes that the comments were made, testimony from Employee Seven revealed that at the Canterbury fire, O'Connor made the comment "fucking women" after getting into a verbal altercation with Complainant. Employee One, Employee Two, Employee Three, Employee Five, Employee Seven, Employee Eight, Employee Ten, Employee Eleven and Employee Twelve revealed that they heard about Complainant being referred to as a "whiny cunt" or the whole department was referred to as "whiny cunts" by O'Connor. Testimony from Employee One revealed that O'Connor using expletives such as "whiny cunt" wasn't surprising because that had become his normal behavior. Testimony from Employee Two revealed that O'Connor's go-to name for name calling was "pussy" and had heard about O'Connor calling firefighters "whiny bitches." Testimony from Employee Seven revealed that Employee Seven witnessed O'Connor make the comment that the department was "pussified" and referred to all firefighters as "fucking cunts." Employee Seven also stated that Complainant was aware of the comments being made about her and that they were heard often. Testimony from Employee Ten revealed that O'Connor used the term "cunt" on a daily basis in meetings with administration, battalion chiefs and in the fire stations. Employee

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

Ten also stated that O'Connor would just put a different adjective in front of the word "cunt." Testimony from Employee Eleven revealed that they were informed by officers that were present at the Canterbury fire that O'Connor called Complainant a "whiny cunt."

Furthermore, testimony from Employee Twelve revealed that O'Connor called other firefighter's "cunts" and mentioned that everyone in the department "tripped on their dicks" and got the job. Employee Twelve also heard from others that O'Connor did not believe that women should be on the department and that the department should only include the "biggest, fastest and strongest." Testimony from O'Connor revealed that O'Connor never referred to Complainant as a "whiny cunt" and only heard of the allegation when Complainant made her complaint with the Commission. Bad language is used within the department and the audience is always respected. Words like "cunt" and "bitch" would never be used in front of a woman because it would not be acceptable. There was an incident brought to light were the term "whiny cunt" was used by O'Connor referring to the people that had an issue with a policy change that Bush was continuously addressing in meetings. It was not used against Complainant. Since that incident was brought to light a few months later, language like "cunt" and "bitch" were no longer acceptable.

Therefore, the testimony revealed that the comments were used multiple times. While one (1) of the terms being used once or twice may not be severe or pervasive enough to create a hostile work environment, the collection of them all being said and repeated could lead to a hostile work environment. The evidence shows that the use of these terms was a common occurrence therefore considered pervasive enough as to create a hostile work environment. The Commission will consider this element met.

### 4. There is a basis for employer liability

An employer is subject to vicarious liability for harassment committed in the workplace. When harassment is committed by an employee with supervisory authority, an employer may or may not have an affirmative defense available, depending on whether a tangible employment action occurred as a result of the harassment. Generally, an employer is strictly liable for harassment committed by a supervisory employee that results in a subordinate employee suffering a tangible employment action. However, if only a hostile work environment is created by the supervisor and no tangible employment action is taken against the employee, an employer may raise an affirmative defense to liability or damages.

A tangible employment action can only be taken by a supervisor and include such actions as termination, demotion, or reduction in pay. A supervisor is someone entrusted with the power to directly affect the terms and conditions of an employee's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer or discipline an employee. Mere authority to oversee aspects of another employee's job performance is insufficient.

In a claim of hostile work environment not resulting in a tangible employment action, the defending employer may avoid liability by showing 1) it exercised reasonable care to prevent and promptly correct harassment, and 2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm. Various ways an employer can show that it exercised reasonable care to prevent or correct the harassment, include but are not limited to, putting in place a

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

policy and grievance procedure that employees are aware of and can utilize, an explicit statement of prohibition against harassment, a fair investigative process, and a determinative outcome. The second prong can be satisfied by respondent showing that the complainant unreasonably failed to follow respondent's harassment policy, such as failing to complain, waiting an unreasonable amount of time to complain, or complaining to a person not designated by respondent's policy.

In this case the evidence revealed that Respondent has a harassment policy that prohibits harassment and if an employee feels they are being harassed they can report it to any supervisor. Testimony from Employee One revealed that shortly after the verbal altercation at the Canterbury fire, Complainant reported to her supervisor, Employee One, that she was harassed based on her sex by O'Connor, Deputy Chief, but Employee One did not follow the policy in fear of retaliation. On February 10, 2018, Complainant went a step further and filed an Allegation of Misconduct against O'Connor. Furthermore, Respondent did not conduct a thorough investigation of Complainant's allegations. Testimony of main witnesses to the altercation indicate that they were not interviewed about the incident at the Canterbury fire. In addition, Respondent never took steps to prevent and stop the comments being made. Therefore, Respondent is liable for the unlawful harassment.

### B. Retaliation

#### Prima Facie Case

Establishment of a prima facie case of retaliation requires evidence as to the following three elements: (1) Complainant engaged in statutorily protected activity; (2) Complainant suffered an adverse employment action; and (3) A causal connection exists between the two events.

#### 1. Complainant engaged in statutorily protected activity

Under Title VII and the Ordinance, a Complainant may demonstrate that they engaged in a statutorily protected activity by showing that they opposed an employment practice that is unlawful under these laws or by showing that they participated in any manner in an investigation, proceeding or hearing under these laws. This includes explicitly or implicitly communicating to Respondent the belief that its activity constituted unlawful discrimination under Title VII and the Ordinance. A Complainant's protest may be broad or ambiguous as long as the protest would have reasonably been interpreted as opposition to such unlawful discrimination or harassment. Statutorily protected activity also includes, but is not limited to, filing a charge, testifying or assisting in an investigation, proceeding, hearing, or lawsuit under these antidiscrimination laws. A Complainant is protected against retaliation even if they are mistaken about the unlawfulness of the challenged practice. It is important to note, however, that a complaint of discrimination is not a safety net protecting employees from adverse action. An employer does not lose the ability to discipline an employee who engages in misconduct simply because the employee communicated to the employer that unlawful discrimination occurred.

In this case, Complainant alleged that she reported harassment to her supervisor within days of an incident between her and O'Connor during a fire at Canterbury in August 2017. Testimony from Employee One revealed that Complainant informed him of an issue that arose between Complainant and O'Connor and that Employee One gathered from the complaint that Complainant believed she was harassed by O'Connor because of her sex.

24



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

Testimony from Employee One revealed that Employee One did not report the issue further up the chain of command in fear of retaliation. Respondent's Harassment and Retaliation Policy states that if an employee feels they are being harassed or retaliated against, they are to notify any supervisor and that a verbal complaint is acceptable. Furthermore, Respondent provided an Internal Complaint of Misconduct filed by Complainant, against O'Connor, on February 10, 2018. In the complaint, Complainant did not mention her sex as a protected class but stated that O'Connor showed conduct that was unethical or tends to demean, debase, ridicule or degrade a fellow firefighter.

Based on the evidence found in this case, the Commission will consider this element met.

### 2.     Complainant suffered an adverse employment action

To satisfy this element, Complainant must produce evidence to show that Respondent took a materially adverse action against them which might deter a reasonable employee from engaging in protected activity. Materially adverse actions include employment actions such as termination, denial of a promotion, non-hire, denial of job benefits, demotion, or suspension. A materially adverse action can be work-related or an even an action that takes place exclusively outside of work, as long as it may well dissuade a reasonable person from engaging in protected activity. However, a petty slight, minor annoyance, trivial punishment, or any other action that is not likely to dissuade an employee from engaging in protected activity in the circumstances is not materially adverse. The facts and circumstances of the particular case determine whether the alleged action is materially adverse.

In this case, Complainant alleged that after she reported harassment, she was subject to further harassment. Complainant alleged that she was called a "whiny cunt," was told by other firefighters that the mandatory harassment training was her fault and was told that she should "just take" the treatment she was receiving because it was what she signed up for. Complainant also alleged that after reporting the harassment, she was sent directly to a City Physician instead of being given the opportunity to retake her WPE after seventy-two (72) hours, was denied a mental health evaluation and placed on alternate duty with scheduled weekends.

Evidence does not exist regarding the allegations that Complainant was sent directly to a City Physician instead of being given the opportunity to retake her WPE after seventy-two (72) hours, was denied a mental health evaluation, was placed on alternate duty with scheduled weekends and was told that she should "just take" the treatment she was receiving because it was what she signed up for. It is not being disputed that Complainant was sent to a City Physician after failing the WPE and put on alternate duty but Respondent's Wellness-Fitness Policy states that if the participant's retest attempt falls between eight (8) minutes and thirty-two (32) seconds and nine (9) minutes and thirty-one (31) seconds, or exceeds nine (9) minutes and thirty-two (32) seconds on any attempt, the participant is referred to the City Physician. The policy also states that if referred to the City Physician, the participant is placed on alternate duty and a consultation with the City Physician is scheduled. The City Physician(s) will review the participant's overall medical and fitness performance and make recommendations regarding their ability to return to full active duty status which may include diagnostic testing or participation in formal reconditioning under the direction of the Peer Fitness Trainer. Furthermore, emails between Complainant and Ramsey and statements from Complainant revealed that Complainant did not report back to work after she



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

failed her WPE on December 7, 2018. The evidence shows that Respondent followed their Wellness-Fitness Policy and ultimately, Complainant did not return to regular or alternate duty after failing her WPE.

Complainant alleged that she was also denied a mental health evaluation after reporting harassment. Testimony from Employee Six, Employee Seven, and Lahey revealed that if an employee feels they need a mental health evaluation they are to go through the City of Fort Wayne EAP program. Testimony from VanWagner revealed that Complainant asked VanWagner about a mental health evaluation and VanWagner directed Complainant to Lahey because she does not handle mental health evaluation requests. Testimony from Lahey revealed that Complainant informed Risk Management that she scheduled an appointment through the EAP program. There is no evidence to suggest that the allegations of Complainant being sent directly to a City Physician instead of being given the opportunity to retake her WPE after seventy-two (72) hours, being denied a mental health evaluation and being placed on alternate duty with scheduled weekends were materially adverse and not likely to dissuade an employee from engaging in protected activity. Furthermore, the Commission could not find any evidence to suggest that Complainant was told to "just take" the treatment she was receiving because it was what she signed up for. Based on the evidence found, the Commission will end the analysis regarding these allegations.

Complainant also alleged that she was harassed further after reporting harassment. Complainant alleged she was called a "whiny cunt" and was told by other firefighters that the mandatory harassment training was her fault. Testimony from Employee One revealed that they heard about O'Connor using the term "cunt" or "whiny cunt" but was not sure who it was regarding. Testimony from Employee Five and Twelve revealed that they heard about O'Connor referring to Complainant as a "whiny cunt" but that O'Connor referred to a group of firefighters as "whiny cunts" as well. Testimony from Employee Seven revealed that they heard rumors about Complainant being referred to as a "whiny cunt" by O'Connor and that Complainant was a nuisance to the administration. Employee Seven heard these comments often and was aware that Complainant was being informed about the comments that were being said about her. Testimony from Employee Eight revealed that they heard about Complainant being referred to as a "whiny cunt" by someone but was not sure who used the word. Testimony from Employee Ten revealed that the entire fire department was under the category of "whiny cunt," not just Complainant. Employee Ten also stated that they never heard anyone refer directly to Complainant as a "whiny cunt." Testimony from O'Connor revealed that he never referred to Complainant as a "whiny cunt" and words like "cunt" and "bitch" would never be used in front of a woman because it wouldn't be acceptable. O'Connor also stated that there was an incident that he used the term "whiny cunt" in reference to a group of individuals that had supposedly had an issue with a policy change. When the incident was brought to light, terms like "cunt" and "bitch" were no longer acceptable.

Testimony from Employee Five revealed that firefighters assumed the training had to do with Complainant filing a complaint. Testimony from Employee Six heard other firefighters make comments about the harassment training that firefighters had to do, and it being enforced because Complainant filed a charge of misconduct along with other allegations that were filed from other firefighters. The evidence regarding further harassment revealed that after Complainant filed an allegation against O'Connor, she was subject to further harassment. Based on the evidence found regarding the further harassment including being called a "whiny cunt" and being blamed for the department being mandated to harassment training the Commission will consider this element met.

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

**3.   A causal connection exists between the two events**

To satisfy this element, Complainant must produce evidence to show a causal connection between the protected activity and the materially adverse action taken. The types of evidence that may support an inference that retaliation caused a materially adverse action include suspiciously close timing between the protected activity and the materially adverse action; verbal or written statements demonstrating a retaliatory motive; comparative evidence of a similarly situated employee who was treated more favorably than Complainant because they did not engage in statutorily protected activity; or any other evidence which may support an inference of retaliatory intent.

In this case, Complainant informed Employee One of harassment based on her sex a few days after the Canterbury fire in August 2017. On February 10, 2018, Complainant filed an internal Allegation of Misconduct against O'Connor. Testimony revealed that after the Allegation of Misconduct was made, Complainant was referred to as a "whiny cunt" and was being blamed for mandatory harassment training that the entire department had to participate in. The Commission will view this element in a light most favorable to Complainant and consider this element met.

### Respondent's Articulated Legitimate, Nondiscriminatory Reason(s)

As noted above, only if Complainant can successfully produce evidence establishing each element of a *prima facie* case does the burden shift to Respondent to articulate a legitimate, nondiscriminatory reason for its employment action. In this case, we have determined that Complainant has produced enough evidence to make out a prima facie case of discrimination. The Commission will examine the Respondent's legitimate, nondiscriminatory reason so clearly articulated.

Respondent stated that Complainant was not subject to further harassment after she filed her complaint of misconduct. O'Connor denied ever calling Complainant a "whiny cunt" and that he was not aware of anyone blaming Complainant for the harassment training in retaliation to Complainant participating in protected activity.

### Pretext

When a Respondent articulates a legitimate nondiscriminatory reason for making an employment decision against a Complainant, evidence has to come forth from Complainant or from the investigation showing that the reason given by the Respondent is a pretext for discrimination.

The pretext element addresses the issue of whether the employer honestly believes in the reason it offers. The fairness or adequacy of the employment action is not relevant to the question of pretext. The pretext analysis is not concerned with whether the decision was right or wrong, fair or unfair, well considered or precipitous. The Commission must look only at whether the reason given actually did underlie the employment action.

In this case, the evidence gathered revealed that Respondent's legitimate, nondiscriminatory reasons were pretextual. Respondent denied that Complainant was ever called a "whiny cunt" or that she was blamed for the mandatory harassment training. Testimony from Employee One revealed that they heard about O'Connor using

## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

the term "cunt" or "whiny cunt" but was not sure who it was regarding. Testimony from Employee Five and Twelve revealed that they heard about O'Connor referring to Complainant as a "whiny cunt" but that O'Connor referred to a group of firefighters as "whiny cunts" as well. Testimony from Employee Seven revealed that they heard rumors about Complainant being referred to as a "whiny cunt" by O'Connor and that Complainant was a nuisance to the administration. Employee Seven heard these comments often and was aware that Complainant was being informed about the comments that were being said about her. Testimony from Employee Eight revealed that they heard about Complainant being referred to as a "whiny cunt" by someone but was not sure who used the word. Testimony from Employee Ten revealed that the entire fire department was under the category of "whiny cunt," not just Complainant.

Testimony from Employee Five revealed that firefighters assumed the training had to do with Complainant filing a complaint. Testimony from Employee Six indicates they heard other firefighters make comments about the harassment training that firefighters had to do, and it being enforced because Complainant filed a charge of misconduct along with other allegations that were filed from other firefighters.

Furthermore, testimony from Employee One, revealed that he did not go up the chain of command with Complainant's allegations because he feared being retaliated against. Testimony from Employee Five revealed that if a firefighter makes a complaint, they are considered a "complainer," so it is an unspoken understanding to handle issues yourself, so you are not retaliated against. Employee Five also stated that they had heard of several complaints related to retaliation for having a difference of opinion or making a complaint and Employee Five was nervous about participating in the Commission's investigation because the initial interviews were conducted in Respondent's offices and believed the time spent in the interview would be monitored.

Based on the evidence above, there is reason to believe that Respondent's legitimate, nondiscriminatory reasons were pretextual.

### C.    **Disparate Treatment/Perceived Disability**

#### **Prima Facie Case**

Establishment of a prima facie case of discrimination in disparate treatment requires evidence as to the following four elements: (1) Complainant is a member of a protected class; (2) Complainant was a qualified employee; (3) Complainant suffered an adverse employment action; and (4) Similarly situated employees outside of the Complainant's protected class were treated more favorably.

##### 1.  **Complainant is a member of a protected class**

The first *prima facie* element is uncontested. The ADA defines an "individual with a disability" as a person who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. In this case, Complainant believed that she was perceived as someone with a disability. The Commission will consider this element met.

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

### 2. Complainant was a qualified employee

In evaluating the issue of whether a Complainant was a qualified employee and meeting Respondent's legitimate expectations, the question is not whether Complainant was qualified for the position of Captain at the time of hire, but whether they were performing well at the time of the alleged adverse employment action.

Complainant alleged that Respondent did not follow the policy in place after she decided not to finish her WPE and sent her directly to a city Physician instead of being given the ability to retake the WPE in seventy-two hours. In this case, Complainant is not qualified because she did not complete the WPE and her evaluation time did not fall in between eight (8) minutes and thirty-two (32) seconds and nine (9) minutes and thirty-one (31) seconds. Respondent's policy states that a passing time for the WPE is less than or equal to eight (8) minutes and thirty-one (31) seconds. A participant can retest after a seventy-two (72) hour resting period if their time falls between eight (8) minutes and thirty-two (32) seconds and nine (9) minutes and thirty-one (31) seconds. If a participant's retest attempt falls between eight (8) minutes and thirty-two (32) seconds and nine (9) minutes and thirty-one (31) seconds, or exceeds nine (9) minutes and thirty-two (32) seconds on any attempt, the participant will be referred to the City Physician.

On December 7, 2018, Complainant attempted her WPE. The WPE for Complainant, provided by Respondent, shows that Complainant stopped at three (3) minutes and thirty-four (34) seconds with events of the exam remaining. Respondent also provided an email from the proctor of the exam to Lahey on December 10, 2018, stating that after the completion of the equipment carry event, Complainant stopped and said that she was done and did not want to continue. Complainant then clocked off her regulation prompting the course to be over. Complainant was advised of the policy in which she had seventy-two (72) hours to retest. Complainant stated that she was tired and had no interest in retesting in seventy-two (72) hours. The proctor was advised to contact the HSO Chief and advised the HSO Chief that Complainant had seventy-two (72) hours to retest.

The HSO Chief also sent an email to Lahey on December 10, 2018, stating that he had spoken to the proctor of the exam about Complainant stopping during her WPE. The HSO Chief stated that he informed the proctor that he would review the policy and see what steps needed to be taken. The HSO Chief consulted with administration and per the policy, Complainant had exceeded the nine (9) minutes and thirty-two seconds on her WPE so she would need to be referred to a City Physician per the policy.

Based on the evidence gathered during this investigation, the Complainant is not a "qualified employee" for purposes of establishing a prima facie case regarding not being able to return to retest after a seventy-two (72) hour resting period. This element has not been met but the Commission will continue the analysis for the sake of completeness.

### 3. Complainant suffered an adverse employment action

Adverse employment action has been defined quite broadly in the Seventh Circuit Federal Court of Appeals, and that broad interpretation has been adopted by this Commission. The Court has articulated three general categories of actionable, materially adverse employment actions for the purposes of Title VII: (1) Those cases in which the employee's compensation, fringe benefits, or other financial terms of employment are reduced,

BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

including termination; (2) Those cases in which a nominally lateral transfer with no change in compensation significantly reduces the employee's career advances by preventing an employee from using their skills and experience, so as to "stunt" an employee's career; and (3) Those cases in which an employee is neither moved to a different job nor the skill requirements of the employee's present job altered, but the conditions in which the employee works are changed in a way that subjects the employee to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in the employee's workplace environment.

In this case, evidence exists as to the third element. It is not being contested that Complainant was not given the opportunity to retest seventy-two (72) hours after failing to complete the WPE. An email provided by Respondent revealed that after Complainant failed to finish the WPE on December 7, 2018 the HSO Chief informed Lahey that per the policy, Complainant would need to be seen by a City Physician. The Commission will consider this element met and continue the analysis.

### 4. Similarly situated employees outside of the Complainant's protected class were treated more favorably

A Complainant may demonstrate that another employee is "similarly situated" to them by showing that there is someone who is directly comparable to them in all material respects. In determining whether employees are similarly situated, the Commission must look at all relevant factors, the number of which depends on the context of the case. Furthermore, in disciplinary cases in which a Complainant claims that they were disciplined by their employer more harshly than a similarly situated employee based on some prohibited reason, such Complainant must show that they are similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

In this case a similarly situated person would be another firefighter. To establish this element, Complainant must show that another firefighter, outside of her protected classes, was able to retake the WPE after seventy-two (72) hours of rest after stopping and not completing the WPE. At the time of the onsite, the Commission requested a list of all relevant employees. From that list, the Commission chose a relevant number of files to examine to determine whether any other individuals were treated more favorably than Complainant. During the review the Commission could not find another firefighter that was able to retake the WPE after seventy-two (72) hours of rest after stopping and not completing the WPE.

There is no evidence as to the fourth element. The Commission will end the analysis here.

## V.  CONCLUSION

Based upon these findings, **no probable cause** exists to believe that Respondent discriminated against Holly H. Volz and perceived her as disabled in violation of The Americans with Disabilities Act Amendments Act of 2008 or Fort Wayne General Ordinance G-21-78, as amended. Pursuant to Commission Rule 1-4.4(c)(1)(A) these allegations are **DISMISSED** as no probable cause.

30



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

However, evidence suggests that **probable cause** exists to believe that Respondent harassed Holly H. Volz on the basis of sex and retaliated against her in violation in violation of Title VII of the Civil Rights Act of 1964, as amended and Fort Wayne General Ordinance G-21-78, as amended. Pursuant to **Commission Rule 1-11.1**, this case will be set for public hearing.

**SO ORDERED** on this 3rd day of March 2021.


Commissioner

31